IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

YVONNA KILPATRICK o/b/o RLK,    )
                                )
        Plaintiff,              )
                                )
    v.                          )        CIVIL ACTION NO. 2:11CV652-SRW
                                )
CAROLYN W. COLVIN, Acting       )
Commissioner of Social Security,)
                                )
        Defendant.              )

## MEMORANDUM OF OPINION

Plaintiff Yvonna Kilpatrick brings this action on behalf of her minor child, RLK,[1]

seeking judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) of a decision by the

Commissioner of Social Security ("Commissioner") denying her child's application for

Supplemental Security Income under the Social Security Act.  The parties have consented

to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c).  Upon

review of the record and briefs submitted by the parties, the court concludes that the decision

of the Commissioner is due to be affirmed.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed.  The

court does not reweigh the evidence or substitute its judgment for that of the Commissioner.

Rather, the court examines the administrative decision and scrutinizes the record as a whole

---

[1]  The court refers to RLK as the "plaintiff" in this memorandum of opinion.

to determine whether substantial evidence supports the ALJ's factual findings.  Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  Factual findings that are supported by substantial evidence must be upheld by the court.  See Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990)("Even if the evidence preponderates against the [Commissioner's] factual findings, we must affirm if the decision reached is supported by substantial evidence.").  The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied.  Davis, 985 F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

## BACKGROUND

Plaintiff's mother filed the present application for supplemental security income in August 2009, a few weeks before plaintiff's thirteenth birthday, alleging disability since January 1, 2003, due to plaintiff's problems concentrating, anger issues, problems getting along with others, anxiety attacks, migraines, ADD, bipolar disorder, and a learning disability.  In a function report she completed at that time, plaintiff's mother indicated that

2

plaintiff has limitations in understanding and using what she has learned, in her social activities and behavior, in taking care of her person needs and safety, and in her ability to pay attention and stick to a task.  (Exhibits 1D, 1E and 2E).[2]  After plaintiff's application was denied at the initial administrative level, plaintiff requested an administrative hearing before an administrative law judge.  (Exhibits 1A, 2A, 3B, 4B, 5B).  The ALJ conducted a hearing on December 8, 2010, during which he heard testimony from plaintiff's mother.  (R. 29-41).  The ALJ issued a decision on February 17, 2011, in which he concluded that the claimant has not been disabled as defined in the Social Security Act since June 24, 2009, the filing date of her application.  (R. 10-25).  On June 16, 2011, the Appeals Council denied plaintiff's request for review. (R. 1-5).  Plaintiff commenced the present action thereafter, seeking review of the Commissioner's final decision.  (Doc. # 1).

## DISCUSSION

### Child Disability

"Federal regulations set forth the process by which the SSA determines if a child is disabled and thereby eligible for disability benefits." Shinn ex rel. Shinn v. Commissioner of Social Sec., 391 F.3d 1276, 1278 (11th Cir. 2004)(citing 42 U.S.C. § 1382c(a)(3)(C)(I) and 20 C.F.R. § 416.906). "The process begins with the ALJ determining whether the child

---

[2]  The court adopts the summary of the medical evidence filed by plaintiff on March 22, 2013.  (Doc. # 17-2).  Dr. McCleod performed mental status examinations on September 22, 2009 and October 28, 2009 that are not included in the summary; on both instances, the results  were the same as those for all of the mental status evaluations Dr. McCleod performed during plaintiff's office visits between August 2009 and September 2010.  (Exhibit 4F).

is 'doing substantial gainful activity,' in which case she is considered 'not disabled' and is ineligible for benefits." Id. (citing 20 C.F.R. §§ 416.924(a), (b)). "The next step is for the ALJ to consider the child's 'physical or mental impairment(s)' to determine if she has 'an impairment or combination of impairments that is severe.'" Id. (citing 42 U.S.C. §§ 416.924(a), (c)). "For an applicant with a severe impairment, the ALJ next assesses whether the impairment 'causes marked and severe functional limitations' for the child." Shinn, 391 F.3d at 1278 (citing 20 C.F.R. §§ 416.911(b), 416.924(d)). This determination is made according to objective criteria set forth in the Code of Federal Regulations (C.F.R.). As the Eleventh Circuit has explained,

> [t]he C.F.R. contains a Listing of Impairments ["the Listings", found at 20 C.F.R. § 404 app.] specifying almost every sort of medical problem ("impairment") from which a person can suffer, sorted into general categories. See id. § 416.925(a). For each impairment, the Listings discuss various limitations on a person's abilities that impairment may impose. Limitations appearing in these listings are considered "marked and severe." Id. ("The Listing of Impairments describes ... impairments for a child that cause[ ] marked and severe functional limitations.").
>
> A child's impairment is recognized as causing "marked and severe functional limitations" if those limitations "meet[ ], medically equal[ ], or functionally equal[ ] the [L]istings." Id. § 416.911(b)(1); see also §§ 416.902, 416.924(a). A child's limitations "meet" the limitations in the Listings if the child actually suffers from the limitations specified in the Listings for that child's severe impairment. A child's limitations "medically equal" the limitations in the Listings if the child's limitations "are at least of equal medical significance to those of a listed impairment." Id. § 416.926(a)(2).

Id. at 1278-79. "Finally, even if the limitations resulting from a child's particular impairment[s] are not comparable to those specified in the Listings, the ALJ can still

4

conclude that those limitations are 'functionally equivalent' to those in the Listings.  In making this determination, the ALJ assesses the degree to which the child's limitations interfere with the child's normal life activities. The C.F.R. specifies six major domains of life:

> (i) Acquiring and using information;
>
> (ii) Attending and completing tasks;
>
> (iii) Interacting and relating with others;
>
> (iv) Moving about and manipulating objects;
>
> (v) Caring for [one]self; and
>
> (vi) Health and physical well-being."

Shinn, 391 F.3d at 1279 (citing 20 C.F.R. § 416.926a(b)(1)). "The C.F.R. contains various 'benchmarks' that children should have achieved by certain ages in each of these life domains." Id. (citing 20 C.F.R. §§ 416.926a(g)-(l)). "A child's impairment is 'of listing-level severity,' and so 'functionally equals the listings,' if as a result of the limitations stemming from that impairment the child has 'marked' limitations in two of the domains [above], or an 'extreme' limitation in one domain." Id. (citing 20 C.F.R. § 416.926a(d) and § 416.925(a)).

### The ALJ's Decision

The ALJ concluded that plaintiff has severe impairments of attention deficit hyperactivity disorder, bipolar disorder, and obsessive compulsive disorder, but that she does

not have an impairment or combination of impairments that medically equals one of impairments in the listings. (R. 13-16). The ALJ further determined that plaintiff does not have an impairment or combination of impairments that functionally equals the listings. He found that the plaintiff has no limitation in the domains of: moving about and manipulating objects, caring for herself, and health and physical well-being. (R. 21-24). In the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others, the ALJ found plaintiff to have "less than marked" limitations. (R. 18-21).

### Plaintiff's Contentions

Plaintiff argues that the Commissioner's decision is not supported by substantial evidence or proper application of the law because the ALJ erred by: (1) rejecting the opinion set forth by her treating psychiatrist, Dr. McCleod, in a November 3, 2010, medical source statement (Doc. # 12, pp. 5-6; see Exhibit 7F); (2) ignoring the opinion of plaintiff's teacher, expressed in a questionnaire sent to the Alabama Disability Determination Service on October 15, 2009 (Doc. # 12, pp. 7-8; see Exhibit 7E); and (3) failing to develop the record either by contacting the consultative examiner for a further explanation of his report of evaluation or by obtaining an additional opinion from a medical expert ("ME"). (Doc. # 12, pp. 8-10).

### *Teacher's Opinion*

As plaintiff notes, the Commissioner's regulations expressly recognize school teachers

6

as among the "other sources" who can provide evidence regarding the limitations caused by a claimant's impairments.  20 C.F.R. 416.913(d).  Exhibit 7E is a "teacher questionnaire" completed at some point between mid-September 2009 and October 15, 2009, by an unidentified person at Florala Middle School .  (Exhibit 7E, R. 130-36).[3]  Plaintiff notes that in the questionnaire, the teacher indicated very serious problems in the functional areas of "acquiring and using information" and "attending and completing tasks."  (Doc. # 12, p. 7)(citing R. 132-33).  She states that "the ALJ made no reference to the teacher's opinion (Exhibit 7E) in [his] decision" and argues that he erred by ignoring it. (Doc. # 12, p. 7).

However, the ALJ's decision makes clear that he did consider the responses in the teacher questionnaire.  As the Commissioner points out, the ALJ cites the questionnaire twice.  (Doc. # 13, pp. 10-11; see R. 19, 21).  The ALJ refers to the teacher's responses in reaching his finding as to plaintiff's limitations in interacting and relating with others. (R. 21)(citing Exhibit 7E).[4]  He also discusses the teacher's observations relating to the

---

[3]  The person who completed the form did not answer the questions relating to his or her opportunity to observe the plaintiff (R. 131, no responses to questions 1-4).  Additionally, the form includes ratings for only five of the six domains; it does not include the page for rating limitations in the domain of health and physical well-being or the signature page.  (Exhibit 7E).  The DDS cover letter transmitting the form to Florala Middle School is dated September 10, 2009; the exhibit bears a fax legend showing that it was transmitted from "Florala City Middle" on October 15, 2009. (R. 130).

[4]  The ALJ states:

With regard to interacting and relating with others, the claimant's teacher reported that the claimant had a slight problem using language appropriate to situation and listener and that she had an obvious problem using adequate vocabulary and grammar to express thoughts or ideas in general everyday conversation (Exhibit 7E).  She did not report any difficulty in getting along with others or respecting and obeying adults.

domain of acquiring and using information.  (R. 19)(citing Exhibit 7E).  He states:

> In a questionnaire submitted on October 15, 2009, one of the claimant's teachers reported that the claimant had obvious problems comprehending oral instructions, reading and comprehending written material, and understanding and participating in class discussions (Exhibit 7E). She reported serious or very serious problems in providing organized oral explanations and adequate descriptions, expressing ideas in written form, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions.

(R. 19). The ALJ concludes that plaintiff has "less than marked" limitations in this functional area, however, noting plaintiff's "average scores on tests of intelligence and academic achievement[,]" and that – although she made poor grades in the first nine-week reporting period of the 2010-11 school year – "her grades have generally been average[,]" and "[i]n spite of her difficulties, the claimant has made adequate progress in regular classes."  (R. 19)(citing  Exhibits 8F, 8E, 11E); see R. 129 (report of contact indicating that plaintiff was in regular classes in seventh grade); R. 138 (report for grades K-6, showing that plaintiff was promoted to the next grade each year and including no notation in the portion of the form designated for recording special education services).

The ALJ's discussion of plaintiff's limitations in "attending and completing tasks" immediately follows this analysis.  In this section of his decision, however, the ALJ does not refer to the teacher's ratings. (See R. 19-20; see R. 133)  He observes that plaintiff's ADHD "results in significant limitations in ability to attend and concentrate, and the claimant has had some difficulties in the past in establishing an effective treatment regimen as a result of

_____

(R. 21).

insurance coverage issues and medication side effects." (R. 20). He points to Dr. McCleod's progress notes as "indicat[ing] that the claimant's symptoms are quite amenable to her current medication, and the condition is under good control with treatment." (Id.). The ALJ was aware that the teacher questionnaire was "submitted on October 15, 2009" (R. 19) and acknowledged the "significant limitations" caused by plaintiff's ADHD before the "good control" resulting from her "current medication" (R. 20). At the administrative hearing, plaintiff's mother testified that plaintiff was then taking Adderall, Seroquel, and Zoloft; there is no indication in the record that plaintiff's prescribed medications changed before the ALJ issued his decision. (R. 35; see also R. 224 (Dr. George's statements that plaintiff's "last visit [at the Dothan Behavioral Health Clinic] was September 13, 2010" and that her medications include Adderall, Seroquel, and Zoloft); Doc. # 17-2 (final entry on plaintiff's evidentiary summary is Dr. George's report)). As the Commissioner argues, Dr. McCleod's notes demonstrate that plaintiff did not begin her medication regimen of Seroquel, Adderall, and Zoloft until October 28, 2009 – two weeks after the Middle School faxed the form to DDS – and, therefore, that the teacher's opinion did not address plaintiff's functioning on her current medications. (See Doc. # 17-2, treatment described at ## 13-18, 20-23; Exhibit 4F). The ALJ's decision as a whole reflects that he did not ignore the teacher's opinion as plaintiff contends, and the court finds no reversible error in the ALJ's consideration of that opinion.

*Treating Physician's Opinion*

9

A month before the administrative hearing, Dr. McCleod, plaintiff's treating psychiatrist, completed a "Medical Source Statement (Mental)" form, in which she expressed her opinion that plaintiff has "marked" limitations in her ability to interact appropriately with the general public; get along with co-workers or peers; understand, remember, and carry out simple instructions; understand, remember and carry out complex instructions; maintain attention and concentration for extended periods; sustain a routine without special supervision; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without and unreasonable number and length of rest periods; and respond appropriately to supervision. (Exhibit 7F, R. 216-17). She further indicated that plaintiff has a "marked" degree of constriction of interests and "moderate" limitations in all the remaining functions she rated. (Id.).[5]  Plaintiff argues that – while her former attorney gave Dr. McCleod the form intended for rating adult claimants – the functions Dr. McCleod rated as "marked" translate to the domains of acquiring and using information, relating with others, and attending and completing tasks. Plaintiff contends that the ALJ erred by according "little weight" to this opinion.  (Doc. # 12, pp. 5-6).

"If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic

---

[5]  The introductory language on the form requests that the physician rate the nineteen listed functions "[i]n addition to the information provided in your narrative report."  (R. 216).  While her treatment notes are in Exhibits 1F and 4F, Dr. McCleod attached no narrative report to the medical source statement in Exhibit 7F.

techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight." Roth v. Astrue, 249 Fed. Appx. 167, 168 (11th Cir. 2007)(citing 20 C.F.R. § 404.1527(d)(2)).  "If the treating physician's opinion is not entitled to controlling weight, . . . 'the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary.'" Id. (citing Crawford v. Commissioner, 363 F.3d 1155, 1159 (11th Cir. 2004)).  "If the ALJ finds such good cause and disregards or accords less weight to the opinion of a treating physician, he must clearly articulate his reasoning, and the failure to do so is reversible error." Pritchett v. Commissioner, Social Security Admin, 315 Fed. Appx. 806 (11th Cir. 2009)(citing MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986)). "When the ALJ articulates specific reasons for not giving the treating physician's opinion controlling weight, and those reasons are supported by substantial evidence, there is no reversible error.  Schuhardt v. Astrue, 303 Fed. Appx. 757, 759 (11th Cir. 2008)(citing Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005)).  The Eleventh Circuit has found good cause for discounting treating physicians' opinions that are "inconsistent with their own medical records." Roth, supra (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)).  "The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion.  Carson v. Commissioner of Social Sec., 373 Fed. Appx. 986, 988 (11th Cir. Apr. 20, 2010)(citing Sryock v. Heckler, 764 F.2d 834, 835 (11th Cir. 1985)).

The ALJ addresses Dr. McCleod's medical source statement as follows:

> I have considered the mental residual functional capacity assessment of Dr.
> McCleod (Exhibit 7F) and find that it is entitled to little weight. In her initial
> examinations of the claimant, Dr. McCleod herself estimated no more than
> moderate symptoms or functional limitations (Exhibit 1F). All the progress
> notes generated since the commencement of treatment reflect that the
> claimant's symptoms have improved with treatment and remain well-
> controlled as long as she takes her medications.  The treatment records suggest
> that the claimant's overall functioning is good.  There is no indication
> whatsoever of the marked limitations described by Dr. McCleod in the form.

(R. 17).  In her initial visit to Dr. McCleod, plaintiff (who was then twelve years old) and her

mother complained of numerous symptoms (see R. 166-69), including, as plaintiff's mother

told Dr. McCleod:

> She is having irritability and mood swings. She acts a lot like me - which is
> bad. It's getting to the point that she's not getting with nobo[]dy, yelling,
> screaming, throwing things, hurting brother and sister by hitting and fighting
> and not getting along with peers at school.  She has a really bad mouth. At time
> she has problems paying attention. She was a totally different child on Focalin.
> She went off the medications due to insurance issues.

(R. 166).  In her mental status examination, Dr. McCleod observed that plaintiff's mood was

constricted and her judgment "poor" but otherwise noted no abnormalities. (R. 169). Dr.

McCleod assessed a number of disorders – bipolar disorder, ADHD, premenstrual dysphoric

disorder, overanxious disorder of childhood and adolescence, panic disorder without

agoraphobia with moderate panic attacks, specific phobia (spiders), sleep disturbance,

impulse control disorder, and conduct disorder (adolescent onset type). She also made a "rule

out" diagnosis of  learning defect, and assessed "sibling relational problem." (R. 170).  Dr.

McCleod started plaintiff on medications for bipolar disorder and ADHD, planned to

schedule her for IQ and achievement testing to assess the learning defect further, and

suggested family therapy for the other problems. (Id.). In a follow-up appointment two weeks later, plaintiff's mother told Dr. McCleod that the Seroquel was "working fine and seems to be helping her sleep" but that plaintiff was unable to take the Concerta due to side effects and was having a hard time with focusing on her homework. Dr. McCleod again noted "constricted" mood and "poor" judgment upon mental status evaluation. (R. 164). She continued plaintiff on Seroquel, discontinued the Concerta, and started her on Focalin. (R. 165).

At her next two-week follow-up appointment, plaintiff and her mother reported that plaintiff was not taking the Focalin. Plaintiff stated it "makes her fuzzy and where she doesn't understand the teacher." Plaintiff's mother claimed that plaintiff's mood was "mean and hateful," but plaintiff disagreed. Plaintiff reported anxiety, increased irritability and "a little" depression, but denied sleep disturbances, high stress level, suicidal ideation, eating disorder, and mental or physical abuse. She reported daily headaches and painful menstrual cycles. (R. 162). Dr. McCleod recorded no abnormal observations in her mental status evaluation. (Id.). She continued plaintiff on the Seroquel, stopped the Focalin, started her on Vyvanse, and scheduled her for follow up in two months. (R. 163). The following week, on September 10, 2009, plaintiff returned to Dothan Behavior Health for her evaluation by Beth Handal, a licensed professional counselor. Handal noted no abnormalities upon mental status evaluation. (R. 160). She observed:

> [RLK] arrived for her appointment accompanied by her mother. An interview was conducted to gather information regarding her academic problems. She

13

attends Florala Middle School and is in the 7 th grade.  No grade failures or retentions are reported. [RLK] has never received an educational assessment of special accommodations within the school system. She reportedly experiences the most difficulty in Math and reading. [RLK] reportedly does pretty well in school if she has a teacher who will take up extra time with her. No problems with speech or language are reported.  Auditory, visual and motor skills are within normal limits. [RLK] currently takes medication for ADHD with moderate effectiveness reported.  She is having stomach discomfort and a decrease in appetite.  This will be further discussed with her psychiatrist. Today the WI[SC]-IV and WIAT-II were administered. [RLK] entered the room freely with minimal interaction noted.  She remained cooperative and had a quiet disposition.  Effort and motivation remained stable.  She was able to easily understand all instructions provided.  No overt signs of inattention or distractible behaviors were observed. [RLK] was on her current medication regimen for testing.

(R. 160; see Exhibit 8F (testing results)).  On the WIAT-II, Plaintiff scored in the "Average" range in mathematics and spelling, and in the "Low Average" range in reading.  (R. 221). On the WISC-IV, she scored in the "Average" range in verbal comprehension and processing speed, and in the "Low Average" range in perceptual reasoning and working memory.  Her Full Scale IQ result was 91, in the "Average" range. (R. 220).  Handel reported that plaintiff's working memory score indicates that, "[i]n general, her skills in attention, concentration, and mental reasoning are in the Low Average range[,]" and her processing speed score indicates that, "[i]n general, her skills in speed of mental problem-solving, attention, and eye-hand coordination are in the Average range."  (Id.).

Plaintiff returned to Dr. McCleod on September 22, 2009, to discuss the test results. At that time, plaintiff's mother reported that plaintiff was having stomach problems and had stopped taking the Vyvanse because it irritated her stomach.  Dr. McCleod dropped the "rule

14

out" diagnosis of learning defect and added obsessive-compulsive disorder, noting that plaintiff will not turn in her school work unless it is "perfect" and will do "the whole thing over" if she makes a mistake rather than making a correction. (R. 193-94). Dr. McCleod continued plaintiff on Seroquel for the bipolar disorder and started her on Adderall for her ADHD. (R. 194). On October 28, 2009, plaintiff's mother told Dr. McCleod that plaintiff "'does pretty well when she takes her medicine[,]'" and that she was attending an after-school program that was "really helping." Plaintiff's mother stated again that plaintiff would not turn in her school work unless it was "'neat and perfect,'" and said that she "'wonder[ed] if [plaintiff] might have some OCD problems.'" (R. 196). Plaintiff told Dr. McCleod that she took her medications "sometimes" and that her grades were "a little better." (Id.). Dr. McCleod again observed no abnormalities in her mental status examination. (Id.). She continued plaintiff on Seroquel and Adderall, started her on Zoloft for the obsessive-compulsive disorder, and scheduled her for follow-up in two months. (R. 197).

On January 7, 2010, plaintiff's mother told Dr. McCleod, "'She does good as long as she takes her medicine, but she forgets to take it a lot.'" Plaintiff stated, "'As long as I take it I can get along with everyone. It's major drama if I don't take it.'" Plaintiff "denie[d] any adverse reactions to the current medication regimen'" but said that "'maybe the focus medicine needs to be increased.'" (R. 198). Dr. McCleod noted no abnormalities upon mental status examination. (Id.). She continued plaintiff on the same medications, and scheduled her for follow-up in two months. In plaintiff's March 8, 2010, appointment with Dr.

McCleod, plaintiff's mother stated: "'She's doing ok except that she still has attitude sometimes. It will make you crazy. She[] doesn't get the concept that taking stuff that doesn't belong to her without asking is stealing. She has taken jewelry out of my jewelry box. She has my engagement ring and I still haven't gotten it back. She is having to pay for it. We had to go get her from her boyfriend's house the other day. She thinks that she's grown.'" (R. 200). Dr. McCleod again noted no abnormalities in her mental status examination. (Id.). She continued plaintiff on the same medications. (R. 201). On May 3, 2010, plaintiff's mother told Dr. McCleod, "'It works good when she takes it. She says that it is to keep her from killing somebody at school. There's a little girl that's starting rumors all the time. We've already been to the gynecologist twice. She started the rumor that [RLK] was pregnant. I get a call almost every week from the principal about something that has been said. I don't think that any of the medicine is causing it. She just has to keep things settled down.'" (R. 202). Dr. McCleod observed no abnormalities upon mental status examination (R. 202) and she continued plaintiff on her medications (R. 203).

On July 19, 2010, plaintiff saw Dr. Jeffers rather than Dr. McCleod. Plaintiff's mother told the doctor that "'She's doing good as long as she takes it'" and that plaintiff was compliant with her medications. Plaintiff denied any problems or medication side effects, and told Dr. Jeffers that she has good sleep with Seroquel. Dr. Jeffers noted no abnormalities in his mental status examination of the plaintiff (R. 204); he continued her on the same medications. (R. 205). On September 13, 2010, plaintiff's mother told Dr. McCleod, "'She

is good as long as she takes the medication.  I can tell when she doesn't.  She still has some attitude and temper sometimes related to school[.] She is still having problems with this one girl.  Grades are better than what they used to be, but they still could be better.  She has a D in math.  She is doing fairly well for now.'" (R. 206).  Dr. McCleod noted no abnormalities upon mental status evaluation, and she continued plaintiff on the same medications.  (R. 206-07).

Several weeks thereafter, on November 3, 2010, Dr. McCleod completed the medical source statement form, indicating moderate or marked limitations in all rated functions. (Exhibit 7F).  The ALJ found the degree of limitation expressed by Dr. McCleod in the form to be inconsistent with her own treatment records and, therefore, accorded the opinion little weight.  (R. 17).  The ALJ's stated reason constitutes good cause for according the opinion little weight, and it is supported by substantial evidence.  Plaintiff's allegation of error as to the ALJ's consideration of Dr. McCleod's opinion is without merit.

*Duty to Develop the Record*

On December 21, 2010 – two weeks after the administrative hearing and just over three months after plaintiff's last visit of record with Dr. McCleod – Dr. Fred George conducted a consultative psychological examination at the ALJ's request. (Exhibit 10F; see R. 31-32).  Dr. George concluded that plaintiff "is functioning at an age-appropriate level in her cognitive, communication, and social skills, and her adaptive behavior. She has significant impairment in her self-control, concentration, and persistence."  (R. 225). He

recommended that plaintiff and her mother "discuss with Dr. McCleod her continued difficulties with focusing and sustaining attention and her school performance difficulties in light of her current ADHD medication." (Id.).  In assigning weight to Dr. George's report, the ALJ states:

> I give substantial weight to Dr. George's assessment (Exhibit 10F), which reflects that the claimant's functioning is generally age-appropriate. While he reported "significant impairment in her self-control, concentration, and persistence," his objective clinical findings reflect merely that her activity level was "somewhat accelerated" and that attention and concentration were "somewhat impaired." He described the claimant as cooperative, but did not comment specifically on the reliability of the self-reported history. In any event, his clinical findings do not suggest the presence of marked impairments in any area. Overall, Dr. George's opinion is well supported by his own clinical examinations and testing, as discussed above, and is generally consistent with the record as a whole.

(R. 17; see also R. 14-15 (ALJ's summary of Dr. George's report)).  As the ALJ observed, Dr. George did not comment on the reliability of the history reported by plaintiff and her mother.  (See R. 223-25).[6]  As further noted by the ALJ, Dr. George described plaintiff's

---

[6] Dr. George noted the following history reported by plaintiff and her mother:

[RLK] indicated she doesn't get along with people; she gets in a lot of fights and has bad mood swings.  She stated one minute she is "kinda happy" and the next minute she is throwing things. There are other times when she stays in her room and doesn't want to be around people.  She reported during her happy moods she is overly happy, giddy, talks fast, her thoughts are racing, she is very distractible and needs less sleep, which she indicated lasts two to three days. She indicated she does not become grandiose or do dangerous things and does not become overly focused.  Her elevated moods, which last from 20 to 30 minutes to two days, are followed by depressed moods, which last days to weeks, when she indicates she is "mean."

Her mother indicates [RLK] has problems getting along with people to the degree that she yells and curses at them.  At times she completely refuses to do her school work and at other times when she does it she does not get completely finished and

activity level as "somewhat elevated" (she moved her feet "off and on" throughout the evaluation and touched her thumb to her fingers one at a time), and he stated that "[h]er attention and concentration during the evaluation appeared somewhat impaired" (she performed five of five correct serial 7s and was able to spell the word "world" backwards, but took eight seconds to subtract 7 from 93, and forty seconds to subtract 7 from 86). (R. 224). Plaintiff contends that the ALJ erred by "extrapolat[ing] [Dr. George's] observation

---

does not pay attention for long periods of time.  She has fights with her brother and sister and has mood swings.  When she does not get her way, she says she wishes she were dead.

* * *

Her mother reports [RLK] was sexually abused at age five and is hyperalert, hypervigilant, and has an exaggerated startle response. [RLK] indicates she has nightmares and flashbacks to these events around two times a week and reacts at times emotionally as if the trauma is happening again.

[RLK] and her mother also reported she engages in compulsive behavior including cleaning three to four hours [a] day and redoing whole homework assignments if she makes one mistake for one to two hours per day.  At times, [RLK] takes so much time redoing her work she does not finish it and hand it in.

[RLK's] mother reports she has difficulties understanding what she reads, expressing her ideas in writing, memory problems, spelling difficulties, arithmetic problem solving, and difficulties organizing her work and homework.

(R. 223).  Dr. George notes that "[RLK] is currently being prescribed Adderall 10 mg in the morning, Zoloft 50 mg in the morning, and Seroquel 40 mg at night by Dr. McCleod.  (R. 224).  In the very next paragraph, however, he observes that plaintiff's most recent visit to Dothan Behavioral Health Clinic was on September 13, 2010, and that her medications at that time were "Seroquel XR 300 mg orally at 6:00 p.m., Adderall XR 5 mg a.m., and Zoloft 25 mg in the morning." (R. 224).  The latter dosages are reflected in Dr. McCleod's treatment notes for the September 13, 2010 office visit.  (R. 207).  He does not indicate whether plaintiff had taken her medications (at either of the two sets of dosages) at the time of his evaluation.  (R. 223-25).  He noted plaintiff's mother's report that plaintiff had frequent disciplinary problems in the past, "but currently is having only minor difficulties."  (R. 224).

19

that R's attention and concentration during the evaluation appeared 'somewhat' impaired (R. 224) to his overall conclusion" that plaintiff has "significant" limitations in this area. (Doc. # 12, pp. 9-10).  She argues that "'somewhat' does not readily translate to 'significant' in terms of quantifying the degree of impairment" and that the ALJ could have developed the record on this point either by contacting Dr. George for clarification of his opinion or by obtaining review by a medical expert. (Id.)(citing 20 C.F.R. §§ 416.912, 416.927(f)(2)(iii)).

The Commissioner's regulations require that the ALJ seek more evidence from a consultative examiner only if his or her report "is inadequate or incomplete." 20 C.F.R. § 416.919p(b)("If the report is inadequate or incomplete, we will contact the medical source who performed the consultative examination, give an explanation of our evidentiary needs, and ask that the medical source furnish the missing information or prepare a revised report."). In determining whether the consultative report is adequate and complete, the Commissioner considers factors including "[w]hether the report provides evidence which serves as an adequate basis for decisionmaking in terms of the impairment it assesses." 20 C.F.R. § 416.919p(a)(1); see also id., subsections (2) - (5)(listing other factors).  In order to reach his conclusion on functional equivalence, the ALJ was required to quantify plaintiff's level of limitation – for each domain as to which her to have limitations – as "less than marked," "marked," or "extreme."  20 C.F.R. § 416.926a(a).  While an assessment of plaintiff's limitations in these precise terms (assuming their usage in accordance with the Commissioner's definitions) might well have been more helpful to the ALJ, the court cannot

conclude that Dr. George's report was inadequate or incomplete so as to give rise to a duty to seek more information from him. See 20 C.F.R. §416.919n(c)(6)(consultative examination report should "describe the opinion of the medical source about your functional limitations compared to children your age who do not have impairments in [the six functional domains]. Although we will ordinarily request, as part of the consultative examination process, a medical source statement about what you can still do despite your impairment(s), *the absence of such a statement in a consultative examination report will not make the report incomplete*")(emphasis added).

The ALJ was not required to view Dr. George's assessment of a "significant impairment in [plaintiff's] self-control, concentration, and persistence" (R. 225) in isolation. In determining where it fell on the regulatory spectrum set forth in § 416.926a, the ALJ did not err by evaluating Dr. George's conclusion in the context of his observations upon clinical examination. The ALJ reasoned that Dr. George's "clinical findings do not suggest the presence of marked impairments" (R. 17) and that Dr. George's description of plaintiff's attention and concentration during the evaluation as "somewhat" impaired indicate a degree of limitation that is no more than moderate. Id.; see R. 20 (finding "a less than marked limitation in attending and completing tasks"); 20 C.F.R. § 416.926a(e)(2)(i)(a "marked" limitation is "more than moderate" but "less than extreme"). The ALJ's analysis of Dr. George's opinion – viewing the consultative examination report as a whole – is reasonable, and the ALJ did not err by failing to contact Dr. George for additional information.

Plaintiff argues that "[t]he ALJ could also have developed the record by obtaining review by a[] medical expert (ME)[.]"(Doc. # 12, p.10)(citing 20 C.F.R. § 416.927(f)(2)(iii)). While the regulation plaintiff cites gives the ALJ the authority to seek the assistance of a medical expert, he was not required to develop the record further unless the evidence before him was insufficient to allow him to make an "informed decision" on plaintiff's claim. See KDB. *ex rel* Bailey v. Social Security Administration, Commissioner, 444 Fed. Appx. 365, 368 (11th Cir. 2011)(finding no error in ALJ's failure to obtain ME testimony or order additional IQ testing "because the evidence in the record was sufficient to permit an informed decision that KDB was not disabled").  Because the evidence before the ALJ was sufficient to allow an "informed decision" as to plaintiff's disability, the ALJ had no duty to further develop the record by obtaining an opinion from an additional medical expert.

Even if the ALJ erred by failing to contact Dr. George or by failing to seek another medical expert opinion, any such error does not require reversal in the absence of an "evidentiary gap" demonstrating unfairness or clear prejudice. See  Smith v. Comissioner of Social Security, 501 Fed. Appx. 875 (11th Cir. 2012)("[A] claimant must demonstrate that she was prejudiced by the ALJ's failure to develop the record before a due process violation will justify remand. In making this determination, we are 'guided by whether the record reveals evidentiary gaps which result in unfairness or "clear prejudice."'")(citing Graham v. Apfel, 129 F.3d 1420, 1423 (11th Cir.1997)).  The court finds no such "evidentiary gap" here.  Plaintiff's argument that the ALJ failed in his duty to develop the record pertains only

to the ALJ's evaluation of plaintiff's limitations in concentration and persistence – *i.e.*, her limitations in a single functional domain.  (See Doc. # 12, pp. 8-10).  Plaintiff would be entitled to a finding of disability only if the additional evidence would have demonstrated an "extreme" limitation in this domain, since the ALJ found no "marked" or greater limitations in any other functional area.  See 20 C.F.R. § 916.926a(a)(functional equivalence requires "marked" limitations in two domains or an "extreme" limitation in one domain).  Even Dr. McCleod (in the medical source statement properly given no weight by the ALJ) assessed no "extreme" functional limitations.  (See Exhibit 7F, R. 216-17).  There is nothing in Dr. George's report to indicate that by "significant" he might have meant "extreme," and nothing in the record suggests that a different medical expert might so conclude upon reviewing Dr. George's report and the other evidence of record.  Thus, plaintiff has not demonstrated that she was prejudiced by the ALJ's failure to develop the record by seeking clarification from Dr. George or the opinion of an additional medical expert. Even if the ALJ erred in this regard, plaintiff has not demonstrated that the error requires that the Commissioner's decision be reversed.

## CONCLUSION

Upon consideration of the record as a whole and the arguments of the parties, the court concludes that the decision of the Commissioner is supported by substantial evidence and proper application of the law and, accordingly, that it is due to be affirmed.  A separate judgment will be entered.

DONE, this 2nd day of August, 2013.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE